FILED
CLERK

1/8/2026

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
MICHAEL SCHWARTZ,

                *Plaintiff*,

   -against-

IMRAN QAZI and FRIENDLY RIDE INC.,

            *Defendants*.

-----------------------------------------------------------X

<u>OPINION AND ORDER</u>

24-cv-00911 (JMW)

**A P P E A R A N C E S:**

    Aneeba Rehman
    Nadia M. Pervez
    **Pervez & Rehman, P.C**.
    6268 Jericho Turnpike
    Commack, NY 11725
    *Attorneys for Plaintiff*

    Joseph Anthony Fazio
    **Joseph A. Fazio Law Offices**
    94 Willis Avenue
    Mineola, NY 11501
    *Attorneys for Defendants*

**WICKS**, Magistrate Judge:

    The question presented is whether Plaintiff was ever employed by Defendant limousine

service company as a supervising dispatcher for purposes of determining whether – if he was so

employed – he is owed wages under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

("FLSA").  At the Initial Conference the parties agreed to proceed on the limited issue of

Plaintiff's employment status with Defendants. (ECF No. 5.)  The Court ordered limited

discovery on that very issue.  Having completed that limited discovery, the parties then stipulated

to a framed-issue bench trial on the sole issue of Plaintiff's employment status. (ECF No. 12.)  A

bench trial was held on January 28, 2025, and resumed on April 1, 2025.[1]  The parties thereafter filed proposed findings of fact and conclusions of law. (*See* ECF Nos. 23-24.)

Upon careful review of the evidence adduced at trial, the parties' proposed findings of fact and conclusions of law, and the controlling law on the issues presented, the Court concludes that Plaintiff has not proven by a preponderance of the evidence that he was employed by Defendants within the coverage of the FLSA. This Opinion and Order constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a).

## ***BACKGROUND***

On February 6, 2024, Plaintiff commenced this action against Defendants, Imran Qazi ("Qazi") and Friendly Ride Inc. ("Friendly Ride"), for claims of unlawful employment under the FLSA. ("FLSA"). (ECF No. 1.)  Plaintiff alleges that he was employed by the Defendants' Limousine company from September 2021 through March 2023 as a "supervising dispatcher." (*Id.* at 3.)  Plaintiff alleges that, pursuant to the provisions of FLSA, he is entitled to recover for: unpaid labor, unpaid overtime compensation, liquidated damages, prejudgment and post-judgment interest, and attorneys' fees and costs.  Alternatively, Plaintiff alleges that, pursuant to New York Labor Law, he is also entitled to recover from Defendants for: unpaid minimum wage, unpaid overtime compensation, failure to provide wage notices, failure to provide accurate wage statements, failure to provide timely wages, liquidated damages, prejudgment and post-judgment interest, and attorneys' fees and costs.

At the Initial Conference on April 30, 2024, the parties identified there was a disputed issue of whether the Plaintiff was an "employee "of the Defendants under the FLSA.  (*See* Electronic Order Dated 04/30/2024.)  This Court directed limited discovery on the issue of

---

[1] The parties agreed to a bench trial on the issue, waiving the right, if any, to a jury. (ECF No. 12.)  In addition, the parties consented to the undersigned for all purposes. (ECF Nos. 6-7.)

whether Plaintiff was employed by Defendants. (*Id.*)  At the Status Conference on October 22, 2024, both parties agreed to conducting a limited bench trial on the threshold issue of whether Plaintiff was an employee of Defendants for purposes of FLSA in lieu of moving for summary judgment. (*See* Electronic Order dated 11/22/2024.)

The bench trial was held on January 28, 2025, and April 1, 2025. (*See* Electronic Orders dated 01/28/2025 and 04/01/2025.)  The following witnesses testified:  Michael Schwartz ("Plaintiff"), Qazi, and Brandon Schwartz ("B. Schwartz"). On day two of the trial, Defendant requested that two additional witnesses be permitted to testify, namely, Travis Arjune and Haluk Kulekci.  Since no prior notice was provided to the Court or Plaintiff, that application was denied and the two were precluded from testifying. *See Patterson v. Balsamico*, 440 F.3d 104, 118 (2d Cir. 2006) (finding that Plaintiff would have impacted and prejudiced if the Court allowed witnesses only disclosed "*ten days before trial*").

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

### *The Burden of Proof*

The burden of proof borne by Plaintiff in determining whether an individual is considered an "employee" under the FLSA is a preponderance of the evidence. *See Tapia v. Blch 3rd Ave. LLC,* No. 14-CV-8529 (AJN), 2016 WL 4581341, at *4 (S.D.N.Y. Sept. 1, 2016), *aff'd sub nom. Tapia v. Blch 3rd Ave LLC,* 906 F.3d 58 (2d Cir. 2018) (under the FLSA and the NYLL, "[p]laintiffs bear the burden of proof to establish all claims and damages by a preponderance of the evidence"). Establishing a fact by a preponderance of the evidence means that it must be proven "more likely true than not true". *Velasquez v. USPS,* 155 F. Supp.3d 218, 227 (E.D.N.Y. 2016) (quoting *Brown v. Lindsay*, 2010 WL 1049571, at *12 (E.D.N.Y. Mar. 19, 2010)); *see also*

*Larson v. Jo Ann Cab Corp.*, 209 F.2d 929, 935 (2d Cir. 1954) ("'Preponderance' is but a long Latinism for the short English words 'weigh more'").

### *The Statutory Framework and Applicable Test*

Under the FLSA, an employer is defined as

> any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C.A. § 203(d).

An employee is defined as "any individual employed by an employer." 29 U.S.C.A. § 203(e)(1); *see also New York v. Scalia*, 490 F. Supp. 3d 748, 778 (S.D.N.Y. 2020) (detailing the above). "This definition is very broad in scope, and given the remedial purpose of the act, it is broadly interpreted to produce justice." Jennifer Brown, FLSA EMPLOYEE EXEMPTION HANDBOOK, ¶ 120 *Determining the Employer/Employee Relationship* (2025), 2024 WL 5032697.

To determine whether an employee-employer relationship exists under the FLSA, courts within the Second Circuit consider: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 305 (E.D.N.Y. 2009); *see also Brock v. Superior Care*, Inc., 840 F.2d 1054, 1059 (2d Cir. 1988) ("The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law."); *Sue v. CE Sec. LLC*, No. 21-CV-57 (AMD) (RML), 2024 WL 1308405, at *7 (E.D.N.Y. Mar. 27, 2024) (citing *Brock*, 840 F.2d at 1059) (same).

4

While the Supreme Court has not yet articulated specific factors that should be

considered in determining an employer-employee relationship for purposes of FLSA, "the

'economic reality' rather than 'technical concepts' is to be the test of employment." *Goldberg v.*

*Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961) (citing *United States v. Silk*, 331 U.S. 704,

713, (1757); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729, (1772)); *see also Silk*, 331

U.S. at 714 n.8 (discussing factors to use when determining an independent contractor versus an

employee).

> The economic realities test is broader than the common law test used to distinguish
> employees from independent contractors. To determine whether an individual is an
> "employee" under the FLSA, courts look to the economic reality of the business
> relationship as a whole. How the parties label the relationship is of little
> consequence. Instead, courts adopt a totality of the circumstances test in which a
> number of factors are analyzed with the focus on whether the worker is
> economically dependent on the hiring party or is in business for him or herself.[52]
> Depending on the court, a four-, five- or six-factor economic realities test may
> apply. … While the courts differ on the factors and their emphasis, they agree that
> the factors are non-exhaustive and that no single factor is determinative.

Laurie E. Leader, *Whose Time Is It Anyway?: Evolving Notions of Work in the 21st Century*, 6
Belmont L. Rev. 96, 107–08 (2019).

It is against this backdrop that the testimony and proof admitted at trial are considered.

### *Proof Adduced at Trial*

Plaintiff worked in the transportation business for most of his professional career and

previously owned two Limousine companies, Ace Luxury and Ace Limo NY, that are no longer

operating. (Tr. 14:4-14.) Ace Limo was shut down in 2020 or 2021. (Tr. 14:19-20.) Relevant

here, Plaintiff worked out of a lot referred to by all parties as the "Oceanside Lot", which was

located at 3800 Hampton Road, Oceanside, New York, 11572 ("Oceanside Lot"). (Tr. 26:5-8;

28-29.) Multiple unrelated limousine companies operated in the Oceanside Lot, including Limo

Rental NY d/b/a "Limo King", Travis's repair shop, and others. (Tr. 28.) Limo King is owned

by Plaintiff's son, B. Schwartz. (*Id.* at 17-20; Tr. 90:11-16.)  Limo King has office space in the

Lot.  (*Id.* at 14-20.) It first appeared that Plaintiff was unemployed following the closure of Ace

Limo in 2020 or 2021, as no testimony was provided as to his employment in between Ace Limo

and the alleged work with Qazi beginning in September of 2021. However, upon cross-

examination, counsel for Defendants reviewed Plaintiff's deposition transcript that indicated

Plaintiff worked as a driver on the weekends for B. Schwartz's limo company once in a while.

(Tr. 91.) As noted above, Plaintiff's son's company was located in the Oceanside Lot.

Defendant Qazi is the president and owner of Friendly Ride Inc., a limousine company.

(Tr. 312:6; 261:9-17.)  Friendly Ride's principal place of business was located at 3272 Gale

Avenue, Long Island City, New York—never in Oceanside. (Tr. 265-66.)  Friendly Ride did

have an "overseas" office located in Pakistan to assist with dispatching. (Tr. 266:2-8.)

B. Schwartz assisted his father in getting a job with Friendly Ride by introducing the

parties as discussed further below. (Tr. 316:22-25; 317:1.) B. Schwartz introduced Plaintiff and

Qazi to one another after Qazi stated that he needed help with the Department of Transportation

("DOT") as well as drivers since he did not have real experience while Plaintiff had a lot of

experience. (Tr. 317:4-20.) Plaintiff and Qazi met in August of 2021 in the Oceanside Lot and B.

Schwartz informed Qazi of Plaintiff's background in the industry. (Tr. 18-19.) This would have

been easy to do considering that Plaintiff admitted both at his deposition and again, at trial that

he had occasionally worked for his son's limo company. (Tr. 91.) Qazi informed Plaintiff he

needed someone to look after his vehicles in the Oceanside Lot. (Tr. 19:18-21.) Two weeks later,

Qazi told Plaintiff that he wanted him to be a dispatcher, get drivers and assist with the New

York State DOT as well as other tasks. (Tr. 19:23-25; 20:1-13.) According to Plaintiff, they

discussed salary would be $1,000 a week and Plaintiff assumed he would get paid on a weekly

basis then. (Tr. 20:14-21.) Plaintiff provided Defendant with his driver's license, and social security card, but was never given any tax forms and never mentioned his alleged employment in his tax returns. (Tr 20:22-23; 21; 43:16-23.) According to Plaintiff, he was hired by Qazi in September of 2021 through a handshake deal. (Tr. 85:8-21.) However later on, when asked about proof or any clarity on witnessing actual hiring of Plaintiff by Defendants, B. Schwartz could not provide a clear answer or evidence, rather he stated Plaintiff worked for Defendants and was hired as an employee. (Tr. 330-31.)

According to Plaintiff, his office was located in the lot in Defendant's space, where his desk was and where he performed all his duties. (Tr. 29:22-25; 30:1-2; 96:18-23.) The lot included offices for all that rented there and a huge yard where vehicles were stored as well as the repair shop to fix any vehicle issues. (Tr. 29: 6-11.) However, Qazi disputed this and testified that he nor his company ever had an office in the Oceanside Lot. (Tr. 264:19-25; 265:1-10.)

Plaintiff stated he would typically work from 9:00am or 9:30am until 6:00 to 7:00pm, but he never kept track of any of his hours. (Tr. 27:20-21; 45:1-8.) Plaintiff stated that he was in constant communication with Qazi to update him with any issues that arose with rides or to get special requests for "VIP" rides. (Tr. 39-40; 81:3-10.) Plaintiff also testified that he spoke with the fleet manager of Friendly Ride, who Plaintiff referred to as "M" and believed his name was Mohammed, on topics such as ensuring drivers were up to date with their license. (Tr. 40:1-6; 84.) Qazi would provide feedback to Plaintiff such as that he was doing a good job. (Tr. 41:2-4.)

Plaintiff's testimony seemed to go back and forth a bit when asked about other concurrent employment. Plaintiff denied working for anyone else while working for Defendants (Tr. 48:24-25; 49:2-4), but at other times admitted that he accepted rides from his own customers on the weekends and sometimes completed "early airport runs" during the work week, as well as for his

7

son. (Tr. 26; 91:14-21; 127:23-25, 128-29.)  B. Schwartz testified that Plaintiff rarely worked for
B. Schwartz and when he did it was in an independent operator and driver capacity. (Tr. 318:4-
16.) B. Schwartz had five vehicles at the Oceanside Lot, but Plaintiff was not involved in the
operation of his company. (Tr. 331-32.)

      Dispatching typically involves booking vehicles and drivers for specific jobs, ensuring
those jobs are completed on time, and that the vehicles are ready to be driven. (Tr. 17:6-17;
143:3-18; 168.)   Dispatchers also typically get job confirmations. (*Id.*; Tr. 24; 51:14-17.)
Plaintiff also alleged he was the go-to-guy for the drivers whenever the vehicles had any issues.
(Tr. 31:7-24.)

      Defendant owned two vehicles at the Oceanside Lot: one Shuttle Bus and a Sprinter Van.
(Tr. 18:21-25; 19:1-21.) B. Schwartz and Plaintiff had no ownership interest in either. (Tr. 46:6-
18; 48:3-18.)  Defendant claimed that the reason the Shuttle Bus was in Oceanside was to have a
driver available for its use. (Tr. 175:20-24.) The agreement between the parties and Plaintiff's
son was to assist with a driver since Defendants only had one bus while Limo Rental had over
twelve. (Tr. 176:1-8.) The Sprinter Van was allegedly being refurbished for a potential joint
venture between B. Schwartz and Qazi. (Tr. 193:11-25; 194:1-3.)  Given that the Sprinter van
was inoperable, Plaintiff would be the dispatcher primarily for the Shuttle Bus.  Defendant's
business hires both employee drivers and independent contractor drivers that fulfill jobs for him
when necessary. (Tr. 136-37.) The dispatcher employees performed many of the same job duties
as Plaintiff. (Tr. 151:3-12.)  Indeed, Defendants' employees, including Plaintiff, were added to
Defendants' insurance policy. (Tr. 155:16-22.)

      Key to understanding Defendant's business is the concept of "*farming in*" and "*farming
out*" jobs. (Tr. 15-16; 163-64.) "*Farming out jobs*" means that if company A books a job for a

vehicle, but the vehicle is already in use, company A would then call company B to see if one of their drivers/vehicles could fulfil that job. (Tr. 15-16.)  Company B gets 80% of the profits from the ride and Company A gets 20% of the profits. (*Id.*)  Profit-splitting between these companies is typically prearranged. (*Id.*) "*Farming in jobs*" on the other hand means that if Company A takes on jobs from other limo companies when those companies cannot meet client demand due to a shortage of drivers or cars. Company A would receive 80% of the profits for fulfilling the job. (*Id.*) The other companies, namely, the referring company or company that "farmed out" the job, keep 20% of the profits. (*Id.*)

Although Plaintiff stated that he worked in the Friendly Ride office in the Oceanside Lot, there was further testimony that left far more questions than answers. For example, the key to the Oceanside Lot was provided to Plaintiff either by B. Schwartz, or Travis, the owner of a repair shop that operated at the Oceanside Lot. (Tr. 86:17-25; 87:1-6.)  Defendants did not have keys to the Lot. (Tr. 265:1-2.)  Plaintiff first asserted that his workplace was in Friendly Ride's office space in the Lot. (*See* Tr. 30, 32, 87, 96.) While questioned on more specifics, Plaintiff asserted that Qazi came to the Lot at least once a week and used a desk within Friendly Ride's area. (Tr. 97.) However, earlier in the testimony, Plaintiff asserted there was only one desk, which Plaintiff would use. (Tr. 96-97.) The description of the floor plan of the office space became confusing at times and contradictory.  There were also key contradictions identified between Plaintiff's deposition and Plaintiff's trial testimony.  As a result, Plaintiff's credibility was challenged, casting doubt on his testimony.  For example, Plaintiff contradicted himself by stating during trial that he would follow a schedule set by Qazi. (Tr. 97:23-25; 98-101.)  However, under cross-examination through the use of prior deposition testimony, when asked whether Plaintiff set his own hours, he conceded that he "pretty much" did. (Tr. 97:23-25; 98:1-4.)

B. Schwartz and Qazi began talking about a joint venture between Friendly Ride and Limo Rental, where they would get vehicles and clients together. (Tr. 46-47.) Plaintiff was unsure if he was also expecting to get a job out of the joint venture. (Tr. 69: 9-11.) The joint venture between B. Schwartz and Qazi ultimately never materialized. (Tr. 47:17-25.) Prior to this proposed joint venture, both companies would farm out jobs to one another given they both share the same lot in Oceanside. (Tr. 50:7-25; 51:1-12.) The farming out/in arrangements were never exclusive, but Plaintiff did make a point of referring jobs to his son's company before he asked other limousine companies. (Tr. 50:19-25.)

Plaintiff also introduced into evidence documents that demonstrated he would receive emails or text messages from Friendly Ride and its drivers. (Tr. 32:11-12; *see also* Plaintiff's Exhibits 3, 7.) Within these messages were examples of directives sent by Qazi to Plaintiff such as (i) "[p]lease moving forward make sure I have the jobs details and drive details before bus or Van moves," or "[p]lease make sure we received all the jobs. It seems like I have to call or text every time I see the Bus or Can out without having a job. Please make sure this does not continue." (Plaintiff's Exhibit 7, DEF001002-04.) To this end, proof was adduced that Qazi had at least some supervisory control.

Plaintiff would stock the vehicles with water, daily newspaper and mints. (Tr. 58:5-12.) However, he would personally go to the store to buy the newspapers and mints without reimbursement. (*Id.* at 13-15.) He did not keep track of the receipts or ask for reimbursement as it was only a few dollars. (*Id.* at 13-25.) Plaintiff never received payment for any of the work he did. (Tr. 18:3-4; 263:18-20.) According to Plaintiff, on a few occasions, he asked Qazi verbally, and the response given was "oh, don't worry, I'm going to pay you, I'm not going to screw you. *We're going to make this venture go* and we're going to do it very well and you're going to be

10

very well taken care of." (Tr. 63:1-10 (emphasis added).) Plaintiff advised Qazi that he quit in March 2023 via phone call.  (Tr. 124:10-15.)  What was not clear was whether he quit "his job" due to his unpaid wages, or whether he quit due to the joint venture's failure/strained relationship between his son and Qazi. It could be viewed that his quitting was a sign that Plaintiff understood he was an employee. However, that is not the test to be applied as discussed further below in the Court's conclusions of law.

Defendants' Exhibit C highlighted a text message from the Plaintiff to Qazi stating, "You and Brandon need to come up with a game plan for me to get a salary, I've been doing this for free, but I think I should be getting paid something." (Tr. 116:2-17; Defendants Exhibit C at 350-51.) There are two possible interpretations of this message: *first*, this was simply Plaintiff asking his son for help getting paid given that his son previously knew the defendant and partially got him the job. *Alternatively*, this message revealed that, in effect, Plaintiff admitted to consensually working for free/volunteering his services in hopes that the joint venture that Qazi and B. Schwartz would pay off and he would get paid from that once consummated.  Based on the testimony alone, either version of events could be true, but it seems more likely than not that Plaintiff admitted he was waiting for the joint venture to succeed so that he could be eventually paid. Indeed, Plaintiff asked his son to have a conversation with Defendant regarding the non-payment and according to B. Schwartz, Qazi stated that Plaintiff deserved to get paid. (Tr. 319-20.) Interestingly, B. Schwartz did not know any details about compensation and did not know what was owed to Plaintiff. (Tr. 320.) Even with Qazi's statement that Plaintiff deserved to be compensated, that alone does not illustrate that payment was to be given by Qazi rather than B. Schwartz or later through a joint venture.

In the same Exhibit C, at page 355, there was yet another puzzling text message sent by the Plaintiff: "I spoke to Brandon, and he agreed for me to start getting paid. So starting on Monday my salary will be $1,000." (Tr. 121: 7-25; 122:1-3.) This text again implies that B. Schwartz would be paying Plaintiff, not Friendly Ride or Qazi.  Again, Plaintiff's explanation as to why he finally quit was inconsistent. During his deposition, the plaintiff stated he quit working in the office due to the rift between Qazi and B. Schwartz. (Tr. 122:20-25; 123-24.)   During trial, the Plaintiff stated he quit because he was tired of false promises and not getting paid. (Tr. 122:8-19.)

Qazi explained at length the structure of his organization, the difference between employees and independent contractors, how these drivers kept their time, and the functions of fleet managers and dispatchers.  (Tr. 133-46.)   He clarified that dispatchers are paid hourly, while fleet managers are salaried (Tr. 138), and explained the job responsibilities of dispatchers, and those descriptions generally matched the responsibilities Plaintiff took upon himself whilst allegedly working for Friendly Ride (*i.e.,* booking trips, booking drivers, farming in and farming out jobs when needed, keeping track of those trips, ensuring those trips are on time, maintaining vehicles, etc.). (Tr. 133-48.)

Qazi clarified that "farm out" drivers need to be on Friendly Ride's insurance policy and the DOT Roster. (Tr. 178:12-18.) Plaintiff appeared on *both* Friendly Ride's insurance policy and the DOT Roster according to Qazi's deposition testimony. (Tr. 158.) At trial, Qazi's admission – through his deposition – was that Plaintiff was added to both records. (*See* Tr. 157-58.) Qazi explained that a DOT roster is when a driver can drive vehicles that have over 14 passengers and are added to this list. (Tr. 156: 22-25.) Qazi, however, offered no plausible explanation as to why Plaintiff was on both, but then said he would likely have to check the

records to make sure whether that was true or not. (Tr. 158:15-19.)  Nothing further was offered by Defendants, and nothing further was submitted post-trial on that issue. The unexplained appearance of Plaintiff on both documents is yet another indication of supervision. Other indicia of Qazi's supervision was the screenshotting of the GPS location of the Friendly Ride bus when Plaintiff used the bus.  (Tr. 142; 183:8-24.) If it is true that the Plaintiff was performing dispatch functions for the use of Friendly Ride's bus, it would likely be Plaintiff's strongest proof that Plaintiff was in effect an employee of Friendly Ride. Defendant's position was that Plaintiff was simply dispatching *for his son's company*, not Friendly Ride. Qazi stated that Plaintiff was the point of contact between Defendants and B. Schwartz and that was how Defendants ensured that Friendly Ride's shuttle bus jobs were completed. (Tr. 151:13-25.) Plaintiff would answer the text messages because "he was running Limousine Rental dispatch." (*Id.*) Indeed, Qazi stated that the Shuttle Bus was in the possession of Ace Limo and Limo Rental. (Tr. 243:23-24; 244:7-13.) So, when a vehicle is in the possession of another company, that company has full control over it. (Tr. 246:2-15.) Qazi believes his insurance company was aware of this but was not certain. (*Id.* at 16-18.) Qazi's testimony regarding informing the insurance companies of his affiliations with other companies including that of B. Schwartz included more speculation and guessing than affirmative answers. (Tr. 251-52.)

B. Schwartz added to the above testimony by illustrating that he and Defendants had prior business together. Qazi and B. Schwartz would give each other jobs for their respective companies. (Tr. 313:2-4.) In the year of 2020, B. Schwartz and Qazi discussed getting into business together but those discussions did not go far. (Tr. 314:3-11.) B. Schwartz testified that Friendly Ride rented space in the Oceanside Lot and in particular B. Schwartz sublet the space to Friendly Ride for $600 per month. (Tr. 315.)  However, there was no sublet agreement and B.

Schwartz is still owed rent monies. (Tr. 332:11-20.) There are no records of the sublease and B. Schwartz testified that the landlord knew of this arrangement as no prior permission was required. (Tr. 334-35.) B. Schwartz never had authority to use the Defendants' vehicles whenever he wanted. (Tr. 323:21-23.) B. Schwartz never had key or access to Friendly Ride's Bus and Shuttle. (Tr. 350:16-21.)

Defendants used a system called Fast Track to record hours worked by all employes. (Tr. 138:8-20.) Qazi did affirmatively answer that after receiving the litigation letter from Plaintiff, he could not recall who Plaintiff was even after reviewing all his documents. (Tr. 253-59; *see also* Plaintiff's Exhibit 1.) It was not until he had a conversation with Plaintiff's counsel that he realized who Plaintiff was. (*Id.*) Defendants keep all employment records including that of payroll, none of which included Plaintiff. (Tr. 262:9-16.) Plaintiff never applied for a position with Defendants and never negotiated salary. (Tr. 263.) Defendants did not make any payments to Plaintiff as he was not employed. Prior to September of 2022, Plaintiff never complained before about compensation and Qazi seemed to think he was paid by someone else. (Tr. 263:21-25; 264:6-12.)

### *Adverse Inference Regarding Non-Production of Requested Discovery*

Plaintiff in his post-trial brief asks the Court to draw an adverse inference for Defendant's non-production of certain documents that was revealed at trial.[2] (*See* ECF No. 24 at 18-24.)

A court may grant an adverse inference instruction for the non-production of evidence upon a showing (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had a culpable state of mind; and (3) that the missing evidence is relevant

---

[2] Courts have broad discretion when determining to impose sanctions for non-production of evidence, which includes an adverse inference. *See Ahmad v. New York Univ.*, No. 22-CV-01248 (JLR), 2025 WL 3022862, at *22 (S.D.N.Y. Oct. 29, 2025). "Although adverse inference instructions 'usually [are] employed in cases involving spoliation of evidence,' a court also may grant an adverse inference instruction for the non-production of evidence." *Icon Int'l, Inc. v. Elevation Health LLC*, 347 F.R.D. 274, 295 (S.D.N.Y. 2024) (quoting *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 54 (S.D.N.Y. 2014)).

to the ... claim or defense [of the other party] such that a reasonable trier of fact could find that it would support that claim or defense.

*Id.* (internal citations and quotations omitted).

When determining state of mind, "the Second Circuit has endorsed a 'case-by-case approach to the failure to produce relevant evidence,' because 'such failures occur along a continuum of fault-ranging from innocence through the degrees of negligence to intentionality.'" *Cordius Tr. v. Kummerfeld*, No. 99-CV-3200 (DLC), 2008 WL 113664, at \*4 (S.D.N.Y. Jan. 11, 2008) (quoting *Reilly v. Natwest Markets Group Inc.,* 181 F.3d 253, 267 (2d Cir.1999)). Thus, courts have discretion to issue *lesser sanctions* depending on the circumstances. *See id.* (discussing that outrageous conduct deserves an adverse inference).

As to the first prong, it is without question that Defendants had an obligation to produce relevant information in a timely fashion. *See Drip Cap., Inc. v. JY Imports of NY Inc.*, 348 F.R.D. 536, 566 (E.D.N.Y. 2025) (stating as to the first criteria, "there is no doubt that Defendants were obligated to produce the requested discovery pursuant to the Court's orders"). Notably, this Court ordered that prior to trial, the parties engage in limited fact discovery as to whether Plaintiff was employed by Defendants. (*See* ECF Nos. 5, 9; Electronic Order dated 9/25/2024.)

Next, where there is no explanation for failure to produce or respond to discovery requests, such as here, non-production demonstrates a "conscious decision deliberately to disregard his duties as a litigant." *Bogosian v. All Am. Concessions*, No. 06-CV-1633 (RRM) (RML), 2011 WL 4460362, at \*7–8 (E.D.N.Y. Sept. 26, 2011). Defendants could have opposed Plaintiff's request for an adverse inference and to date, have not.[3]  Moreover, at Qazi's

---

[3] While the Court did not set a briefing schedule on this particular issue, Defendants should not be surprised that Plaintiff addressed this in the post-trial briefs as indicated numerous times on the trial record. Indeed, once Plaintiff filed his proposed findings of fact and conclusions of law, Defendants could have asked for leave to respond to Plaintiff's request for an adverse inference. No applications were before the Court. Thus, Plaintiff's adverse inference portion of the post-trial briefings remains unopposed.

deposition, Qazi admitted that he had not done a thorough search to see if relevant documents were in his possession apart from text messages. (*See* Tr. 214-15.) This was because Qazi believed the Complaint was "baseless". (Tr. 214:3-7.) Additionally, when such issues were discussed at trial, Defendants stated that either the documents were not requested, or they were overbroad. (*See e.g.*, Tr. 211; 240; 298; 303.) The documents not produced were in fact requested, and some of the requests included representations by Defendants that they either had no possession of the documents or were submitted. (*See* ECF No. 24-7; *see also* ECF No. 24-8 as to interrogatories.) Nonetheless, Qazi's assertions at trial that he would have to look back or check, indicates that it is more likely than not, that these documents exist in Defendants' possession. Therefore, as to the second element requiring a culpable state of mind, that element is sufficiently met. The third prong is likewise met here. The missing discovery is relevant—both to Plaintiff's claims and Defendants' defenses. It refers to GPS information, emails, texts, insurance documents, and driver rosters, all of which would benefit one party in some aspect. Accordingly, all three factors have been satisfied.

Yet, at the same time, Plaintiff *never complained* of the failure to produce prior to trial. *See Aniero Concrete Co., Inc. v. New York City Constr. Auth.,* 308 F.Supp.2d 164, 185 (S.D.N.Y. 2003). Plaintiff avers that it never filed a motion to compel as he assumed all discovery was produced. (ECF No. 24 at 24.) Indeed, similar issues were presented at Qazi's deposition and, thereafter, Qazi produced some documents. (*Id.* at n.3.) None of these issues were raised with the Court during the discovery phase, namely, Plaintiffs did not move to compel or otherwise alert the Court of potential discovery issues. *See Lucky Brand Dungarees, Inc. v. Ally Apparel Res. LLC,* No. 05-CV-6757 (LTS) (MHD), 2010 WL 167949, at *1 (S.D.N.Y. Jan. 13, 2010) (stating that "the timing of the instant motion, alone, is sufficient reason to deny

Plaintiffs the requested adverse inference," due to Plaintiffs' failure to notify the court earlier of discovery issues). Failure to raise discovery issues before trial limits the Court's ability to assess whether the documents were specifically demanded and whether viable objections existed to not produce. Notwithstanding, even if the Court were to draw an adverse inference, the result would not change.

Some of the documents that were not produced by Defendants should have been in Plaintiff's possession as well. For example, Plaintiff asked Qazi at trial if he searched for relevant emails between him and Plaintiff, and the answer was no. (Tr. 215:4-11.) These emails should be in Plaintiff's possession if they exist as Plaintiff was a recipient of the email. This is true for another email that Qazi allegedly sent to Plaintiff regarding a joint venture in connection with the Shuttle Bus. (*See* Tr. 153: 20-25; 154:1-6.)  Likewise, the messages that were not produced that were between the parties, should be in Plaintiff's control, custody or possession. (Tr. 153:6-10.)  Prejudice to the party not receiving production tends to be less when discovery can be obtained from alternative means. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 508 (S.D.N.Y. 2022) (citation and quotations omitted) ("Where Plaintiffs have been able to obtain discovery from alternative sources, the evaluation of prejudice shifts from one of kind to one of degree.")

The remaining non-produced documents do not with certainty address that Plaintiff was an employee. Such documents include GPS tracking (Tr. 298:10-22), driver rosters (Tr. 209-211), reconciliation documents (Tr. 300:3-18), and insurance information (Tr. 239:5-24). First, the GPS tracking documents that could show whether the Shuttle Bus was parked in the Oceanside Lot would not indicate if Plaintiff was employed with Defendants rather than by his son. Similarly, the Shuttle Bus was going to be part of a joint venture if it had successfully

formed. (*See* Tr. 154:20-24.) Second, as to the driver rosters, these documents would demonstrate what drivers were allowed to drive the Shuttle Bus, not the status of Plaintiff. At trial, Qazi was asked questions regarding drivers for that Bus, and Qazi stated that a special license was required to drive the Shuttle Bus. (*See* Tr. 184:18-19.) Third, as to reconciliation documents, these financial documents as to what was owed, if anything, in connection with the Shuttle Bus goes again to the possible joint venture. (*See* Tr. 277:19-21.) Lastly, as to the insurance documents, Qazi testified that he informed his insurance company of another company using the Shuttle Bus. (Tr. 239-40.) This would have helped Defendant's defenses rather than Plaintiff's claims. The relevant non-produced documents must also be favorable to the other party in order to issue such an "extreme sanction." *Foster v. United States*, 771 F. Supp. 3d 341, 370 (S.D.N.Y. 2025).

Accordingly, after careful consideration, even if the requested discovery was produced and through the lens of an adverse inference, the evidence and testimony adduced at trial suggests that Plaintiff would still has not met the required burden as set forth below.

### *The Legal Conclusions*

As a threshold matter, this Court has federal question subject matter jurisdiction, *see* 28 U.S.C. § 1331, since the action arises under Section 17 of the FLSA. *See* 29 U.S.C. § 217. The FLSA defines, in broad terms, what constitutes an employer under the law. The FLSA describes an employer as "any person acting directly or indirectly in the interests of an employer in relation to an employee." 29 U.S.C. § 203(d).

"For liability to attach under the FLSA or the NYLL, a defendant must be an 'employer.'" *Weng v. New Shanghai Deluxe Corp*, No. 19-CV-9596 (ER), 2022 WL 5434997, at *4 (S.D.N.Y. Oct. 7, 2022) (quoting *Ruixuan Cui v. E. Palace One, Inc.*, No. 17-CV-6713

18

(PGG), 2019 WL 4573226, at *6 (S.D.N.Y. Sept. 20, 2019) (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).[4] To make out a prima facie showing of a violation under the minimum wage and overtime provisions of the FLSA, Plaintiff must be a covered employee under the FLSA. *See Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 121 (E.D.N.Y. 2011) (internal quotations omitted); *Ferreira v. Brooklyn's Constructions & Desings Inc.*, No. 22-CV-03796 (MKB) (VMS), 2024 WL 5386542, at *6 (E.D.N.Y. Mar. 15, 2024). "To be an employer under the FLSA and NYLL, a person must possess control over a company's actual operations in a manner that relates to a plaintiff's employment." *Lauriano v. Lucky Chicken Corp.*, No. 23-CV-9028 (DEH), 2025 WL 1808701, at *1–2 (S.D.N.Y. July 1, 2025) (quoting *Argudo v. Parea Grp. LLC*, No. 18-CV-678, 2019 WL 4640058, at *2 (S.D.N.Y. Sept. 24, 2019)).

In *Ferreira*, the Court described the commonly used "economic reality" test to determine whether an employee-employer relationship exists. *Ferreira*, 2024 WL 5386542, at *6-7; *see also Velu*, 666 F. Supp. 2d at 305 (citing *Goldberg*, 366 U.S. at 33). To determine whether an employee-employer relationship exists under the FLSA, courts in the Second Circuit have considered: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Velu*, 666 F. Supp. 2d at 306; *see also Vera v. The 6 Grp., LLC*, No. 21-CV-03696 (HG) (PK), 2025 WL 405816, at *2 (E.D.N.Y. Feb. 5, 2025) (quoting *Thomas v. TXX Servs.,*

---

[4] "[C]ourts in this district have applied the same tests to determine whether an individual constitutes an employer under the FLSA and the NYLL." *Id.* (citing *Olvera v. Bareburger Grp. LLC*, 73 F. Supp. 3d 201, 206 (S.D.N.Y. 2014)). Therefore, the Court does not provide a separate analysis for the NYLL claims.

*Inc.*, 663 F. App'x 86, 88–89 (2d Cir. 2016)) (same). This inquiry is made "on a case-by-case basis by review of the totality of the circumstances." *Fernandez v. Pinnacle Grp. NY LLC*, No. 21-CV-10702 (AT), 2024 WL 2055059, at *7 (S.D.N.Y. May 7, 2024) (quoting *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013)). Thus, some Courts have used what is known as "core" *Carter* factors to determine is a party is an employer. *Cano v. Tremson Recycling LLC*, No. 24-CV-1612 (JGK) (RWL), 2025 WL 964552, at *5 (S.D.N.Y. Mar. 14, 2025), *report and recommendation adopted sub nom. Gonzalez v. Tremson Recycling LLC*, No. 24-CV-1612 (JGK), 2025 WL 964253 (S.D.N.Y. Mar. 31, 2025); *see also Lopez v. J&L Sky Contractors Corp.*, No. 24-CV-7661, 2025 WL 1859690, at *12 (E.D.N.Y. July 7, 2025) (citing *Carter v. Dutchess Community College. See* 735 F.2d 8, 12 (2d Cir. 1984) (the factors are: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.")); *Lauriano*, 2025 WL 1808701, at *2 (same).

### 1. *Degree of Control by Employer*

"When it comes to 'employer' status under the FLSA, control is key." *Lopez v. Acme Am. Env't Co.*, No. 12-CV-511 (WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012) (citing *Herman*, 172 F.3d at 135). There are different concepts to control—formal or functional.

> When evaluating formal control, courts consider "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Formal control does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees. … [Whereas,] a person or entity, even if lacking formal control, exercised "functional control" over an employee. [The Second Circuit … identified the following as pertinent, although not exclusive, factors: (1) whether [alleged employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business

20

that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [alleged employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [alleged employers'] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [alleged employers].

*Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 132–33 (S.D.N.Y. 2020) (internal citations omitted) (alterations in original).

There was paucity of evidence adduced to support the claim that the Defendant controlled Plaintiff. Only two facts support this, namely, Plaintiff performing dispatch functions for Defendants, but even that fact is vague and unclear as to whether this function was performed for Defendants or B. Schwartz. The second is the messages to Plaintiff from Qazi to "make sure" certain details were provided to Qazi. (Plaintiff's Exhibit 7, DEF001002-04.) Thus, apart from these minimal interactions, nowhere in the record is there support that Defendants exercised control or supervision over Plaintiff's activities. *Cf. Irizarry*, 722 F.3d at 104 (finding control where the employer's involvement was daily and dealt with customer complaints). Both facts could support the inference that Plaintiff was working for B. Schwartz.

Given the facts that Plaintiff made his own schedule, the lack of employment records, and no rate of compensation discussed or materialized between the parties, there could not be formal control here. (*See* Tr. 97:23-25; 98:1-4; 262:9-16; 263:21-25; 264:6-12.) Likewise, the concept of functional control seems to be a stretch. A review of the factors that apply demonstrate that Plaintiff's description of his workspace was confusing, supervision did not exist here, and Plaintiff did not perform a discrete "line-job" as Defendants had other dispatchers. *See Benzinger*, 447 F. Supp. 3d at 132–33; *see also* Tr. 266:2-8, 19-24; 30, 32, 87, 96-97. However, it appeared that Plaintiff while not exclusively working for Defendants, did predominately work for them. (*See* Tr. 48:24-25; 49:2-4; 26; 91:14-21; 127:23-25, 128-29; 318:4-16.)

21

Notwithstanding that last factor, *in toto*, formal or functional control was not established.

2. ***Workers' Opportunity for Profit or Loss and Their Investment in the Business***

Other than promises of a future venture that in fact never materialized, there was no evidence to support even an inference that Plaintiff had opportunity for profit and loss in the business.

3. ***Degree of Skill and Independent Initiative Required to Perform the Work***

There was no dispute that Plaintiff had skills to complete this type of job due to his prior experience of owning a limo company. (Tr. 14:4-14; 317:4-20.)  Thus, Plaintiff would not need training from Defendants and in any event, could have sought guidance from his son, B. Schwartz. However, Plaintiff would likely not need such guidance considering his forty plus years of working in this type of industry. (Tr. 19:15-17.) Indeed, when asked if Qazi told Plaintiff how to perform, his response was "[w]ell, my knowledge of all the years I'm doing it I knew." (Tr. 40:17-19.) Therefore, Plaintiff was well versed in what the role entailed.

4. ***Permanence or Duration of the Working Relationship***

Plaintiff "worked" *with* Defendants for about two years with no guarantee for promotions or payment. The lack of employment records or a true promise of compensation illustrates that permanent placement, if any, was not apparent. (Tr. 262:9-16; 263.) Indeed, no application or extrinsic evidence besides Plaintiff's testimony that there was a "handshake" deal was submitted at trial or with post-trial briefs. (*See* Tr. 85:8-21; 263.)

One case is instructive here. In *Napoli v. Deluxe Corp.*, Plaintiff brought claims for unpaid wages after she had worked for fourteen months without pay. No. 17-CV-6956 (SJF)(SIL), 2019 WL 2579133, at *4 (E.D.N.Y. June 21, 2019). Similar to the instant matter, the Plaintiff conceded that no rate or method of pay was discussed, and the Court wrote that absent

22

such an agreement raised "the question of whether she had an expectation of compensation from Defendants." *Id.* The Court discussed the various types of cases where the FLSA does not cover unpaid wages such as (i) when a plaintiff works without promise or an expectation of payment and instead for their own personal reasons, (ii) volunteer services, (iii) educational purposes or (iv) a spouse working for the other. *Id.* Importantly, the Court stated that,

> [n]ot everyone who performs "work" is an "employee" for purposes of labor laws. While the definition of "employee" is broad, consistent with the FLSA's remedial purpose, it does not cover persons "who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947); *see also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985) (noting that "[a] individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the [FLSA]" (quoting *Walling*, 330 U.S. at 152)).

*Id.* (citations cleaned up).

Thus, the Court in *Napoli* granted the motion to dismiss because "there [was] no factual context in which to evaluate the lone fact that she purportedly "worked" for fourteen months with absolutely no compensation." *Id.* at *5. Similarly, here, little evidence was adduced to support that Plaintiff was indeed an employee of Defendants.

### 5. *Extent to Which the Work is an Integral Part of Employer's Business*

This factor seems to lean in Plaintiff's favor. Plaintiff was an integral part to Defendants' company. Defendant needed a dispatcher to complete the scheduling of the vehicles and Plaintiff was well-versed in this type of work. (*See* Tr. 14:4-14; 317:4-20.) However, at the same time, Defendant had other employees that were hired for dispatchers. Indeed, on cross-examination, Qazi testified that Friendly Ride had one to two dispatchers, who worked at the Long Island City location as well as others at the Pakistan office. (*See* Tr. 266: 2-8, 19-24.) Therefore, whether Plaintiff viewed himself as an integral part of Defendants' business is not enough.

23

### 6. *__Totality of the Circumstances__*

As previously noted, since Courts have applied the same standard for FLSA and NYLL claims, the Court need not provide a separate analysis for Plaintiff's NYLL claims. *See Napoli v. 243 Glen Cove Ave. Grimaldi, Inc.*, 397 F. Supp. 3d 249, 268 (E.D.N.Y. 2019) (bench trial) (collecting cases) ("[T]he Court's analysis under the FLSA applies equally to the claims under the NYLL and is not addressed separately.")

Majority of the factors weigh in Defendants' favor. While there was some testimony that suggested some acts lead to a view of supervisory control, more demonstrated that Plaintiff did work directly for Defendants. *See Feng v. Kelai Corp.*, 727 F. Supp. 3d 423, 442 (S.D.N.Y. 2024), *appeal dismissed* (June 13, 2024) (collecting cases and discussing that owners or investors with limited daily involvement does not mean that individual is an employer).  Even those acts relied upon could fairly be viewed as Plaintiff performing work in connection with B. Schwartz's business, not for Qazi. Accordingly, viewing the above in a totality of the circumstances, Plaintiff has not proven by a preponderance of the evidence that Defendants were his employer. *See Figurowski v. Marbil Invs., LLC*, No. 14-CV-7032(JS)(AKT), 2018 WL 1582072, at *8 (E.D.N.Y. Mar. 30, 2018) (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)) (granting summary judgment in favor of Defendants because plaintiff was not an employee, but rather helped her husband who was an employee) ("However, while the FLSA's coverage is broad, the Supreme Court has explained that '[t]he definition 'suffer or permit to work' was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another.'")

## **CONCLUSION**

For the foregoing reasons, the Clerk of the Court is directed to enter judgment in favor of

Defendants on all Seven Causes of Actions in the Complaint (ECF No. 1). The Clerk of the

Court is respectfully directed to close out the case.


Dated:  Central Islip, New York
        January 8, 2026

S O   O R D E R E D:

/S/ *James M. Wicks*
JAMES M. WICKS
United States Magistrate Judge